No. 13-1053
_____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT
_____

NATIONAL ASSOCIATION OF TOBACCO OUTLETS, INC., *et al.*
*Plaintiffs-Appellants*

v.

CITY OF PROVIDENCE, RHODE ISLAND, *et al.*
*Defendants-Appellees*
_____

On Appeal From The United States District Court
For The District of Rhode Island
_____

## BRIEF OF *AMICUS CURIAE*
## TOBACCO CONTROL LEGAL CONSORTIUM
## IN SUPPORT OF DEFENDANTS-APPELLEES
## AND AFFIRMANCE

### (FIRST AMENDMENT ISSUES)

Seth E. Mermin                        Raymond A. Marcaccio
Thomas C. Bennigson                   (#73443)
PUBLIC GOOD LAW CENTER                OLIVERIO & MARCACCIO, LLP
3130 Shattuck Ave.                    55 Dorrance Street, Suite 400
Berkeley, CA 94705                    Providence, RI 02903
(510) 393-8254                        (401) 861-2900 x102
(510) 849-1536 (facsimile)            (401) 861-2922 (facsimile)
TMermin@publicgoodlaw.org             RAM@om-rilaw.com

*Attorneys for* amicus curiae *Tobacco Control Legal Consortium*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

No party to this filing has a parent corporation, and no publicly held corporation owns 10% or more of the stock of any party to this filing.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ....................................................... i

TABLE OF AUTHORITIES ................................................................ iv

INTEREST OF *AMICUS CURIAE* ........................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT......................................3

ARGUMENT ...........................................................................6

I.   THE PRICE ORDINANCE IS AN UNEXCEPTIONAL
     REGULATION OF COMMERCIAL CONDUCT THAT DOES
     NOT IMPLICATE THE FIRST AMENDMENT ............................................6

     A.   Regulation Of Pricing, Like Other Regulation Of Commercial
          Transactions, Is Subject To Rational Basis Review.................................6

     B.   The Price Ordinance Regulates Commercial Transactions,
          Not Commercial Speech. ......................................................9

          1.   The Ordinance governs pricing, not communications
               about pricing ..............................................................9

          2.   Any commercial speech restricted by the ordinance is
               related to illegal activity and therefore not protected by
               the First Amendment ....................................................12

     C.   Coupons And Other Discounting Mechanisms Are No More
          Communicative Than Any Other Retailer Pricing Strategies ................16

          1.   Multi-tiered price structures are employed for business
               reasons unrelated to expression ......................................16

          2.   Transactions involving coupons and multi-pack discounts
               do not themselves constitute speech ................................19

          3.   Selling products at a discount is not even expressive conduct........22

ii

II.    THE PRICE ORDINANCE EASILY WITHSTANDS ANY
       POTENTIALLY APPLICABLE REVIEW UNDER THE
       FIRST AMENDMENT ................................................................26

    A.    The Only Potentially Relevant Standard Is That Applied
          To Restrictions On Expressive Conduct ...................................26

    B.    The *O'Brien* Test Is Not A Stringent Standard ......................28

    C.    The Price Ordinance Readily Passes The *O'Brien* Test .........30

          1.    The Ordinance falls squarely within the City's authority ...............30

          2.    The Ordinance advances important government interests. ..............31

          3.    The City's interest is unrelated to the suppression of
                expression ...................................................................31

          4.    The Ordinance effectively promotes the government's
                objectives. ...................................................................32

CONCLUSION ...................................................................35

CERTIFICATE OF COMPLIANCE ...................................................36

CERTIFICATE OF SERVICE ...........................................................37

APPENDIX: Tobacco Control Legal Consortium .................................38

# **TABLE OF AUTHORITIES**

CASES

*44 Liquormart, Inc. v. Rhode Island*,
  517 U.S. 484 (1996)......................................................................11

*Armour v. City of Indianapolis*,
  132 S. Ct. 2073 (2012)....................................................................6

*Bailey v. Morales*,
  190 F.3d 320 (5th Cir. 1999)..........................................................24

*Bridges v. California*,
  314 U.S. 252 (1941)........................................................................3

*Cent. Hudson Gas & Elec. Corp. v. Public Svce. Comm'n*,
  447 U.S. 557 (1980)................................................... 11, 14, 24, 29

*Chaplinsky v. New Hampshire*,
  315 U.S. 568 (1942)......................................................................21

*City of Dallas v. Stanglin*,
  490 U.S. 19 (1989).........................................................................23

*Clark v. Cmty. for Creative Non-Violence*,
  468 U.S. 288 (1984)......................................................................24

*Coldwell Banker Residential Real Estate Servs. v. Clayton*,
  475 N.E.2d 536, 540 (Ill. 1985) ....................................................11

*Coldwell Banker Residential Real Estate Servs. v. Missouri Real Estate Comm'n*,
  712 S.W.2d 666 (Mo. 1986).............................................. 10, 12, 15

*Coldwell Banker Residential Real Estate Servs. v. N. J. Real Estate Comm'n*,
  576 A.2d 938 (N.J. Super. Ct. App. Div. 1990).......................11, 16

*Discount Tobacco City & Lottery v. United States*,
  674 F.3d 509 (2012).......................................................... 12, 24, 29

iv

*FDA v. Brown & Williamson Tobacco Corp.*,
   529 U.S. 120 (2000).................................................................5

*Gun Owners' Action League, Inc. v. Swift*,
   284 F.3d 198 (1st Cir. 2002) .............................................24

*In re Bd. of Pharmacy Decision to Prohibit the Use of Advertisements Containing Coupons for Prescription Drugs*,
   465 A.2d 522 (N.J. Super. Ct. App. Div. 1983)..............................15

*In re Permian Basin Area Rate Cases*,
   390 U.S. 747 (1968)...............................................................7

*Jones v. Vilsack*,
   272 F.3d 1030 (8th Cir. 2001).............................................20

*Kittery Motorcycle, Inc. v. Rowe*,
   320 F.3d 42, 47 (1st Cir. 2003) ...........................................4

*Lamar Outdoor Adver., Inc. v. Miss. State Tax Comm'n*,
   701 F.2d 314 (5th Cir. 1983).............................................14

*Lochner v. New York*,
   198 U.S. 45 (1905)...............................................................4

*Lorillard Tobacco Co. v. Reilly*,
   533 U.S. 525 (2001)...............................................27, 29, 31, 34

*Mastrovincenzo v. City of New York*,
   435 F.3d 78 (2d Cir. 2006)...................................................3

*Mora v. Mejias*,
   223 F.2d 814 (1st Cir. 1955) .............................................22

*Nebbia v. New York*,
   291 U.S. 502 (1934).............................................................22

*Ohralik v. Ohio State Bar Ass'n*,
   436 U.S. 447(1978)...............................................................3

*Philip Morris USA, Inc. v. San Francisco*,
    345 F. App'x 276 (9th Cir. 2009)...........................................................21, 26

*Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*,
    413 U.S. 376 (1973).........................................................................14

*Ralph Rosenberg Court Reporters, Inc. v. Fazio*,
    811 F. Supp. 1432 (D. Haw. 1993) ...................................................16

*Rockwood v. Burlington*,
    21 F. Supp. 2d 411 (D. Vt. 1998) ....................................................12

*Rumsfeld v. Forum for Acad. & Inst. Rights, Inc.* (*FAIR*),
    547 U.S. 47 (2006)......................................................................23, 28

*Safeway Stores, Inc. v. Oklahoma Retail Grocers Ass'n, Inc.*,
    360 U.S. 334 (1959).........................................................................8

*Simonetti, Inc. v. State ex rel. Gallion*,
    132 So. 2d 252 (Ala. 1961) ............................................................7

*Sorrell v. IMS Health Inc.*,
    131 S.Ct. 2653 (2011).....................................................................25

*South Ogden CVS Store, Inc. v. Ambach*,
    493 F. Supp. 374 (S.D.N.Y. 1980) ...................................................15

*Spence v. Washington*,
    418 U.S. 405 (1974).......................................................................23

*State v. Chepilko*,
    965 A.2d 190 (N.J. Super. App. Div. 2009) ......................................25

*Tenoco Oil Co., Inc. v. Dep't of Consumer Affairs*,
    876 F.2d 1013 (1st Cir. 1989) ..........................................................6

*Texas v. Johnson*,
    491 U.S. 397 (1989).......................................................................27

*Turner Broad. Sys., Inc. v F.C.C.* (*Turner I*),
    512 U.S. 622 (1994)......................................................................32

*Turner Broad. Sys., Inc. v F.C.C.* (*Turner II*),
    520 U.S. 180 (1997)......................................................................32

*United States v. Carolene Products Co.*,
    304 U.S. 144 (1938)........................................................................6

*United States v. Evans*,
    699 F.3d 858 (6th Cir. 2012)........................................................13

*United States v. Hamilton*,
    699 F.3d 356 (4th Cir. 2012)........................................................28

*United States v. O'Brien*,
    391 U.S. 367 (1968)......................................................5, 22, 26-30, 32

*United States v. Philip Morris USA, Inc.*,
    566 F.3d 1095 (D.C. Cir. 2009) ....................................................21

*United States v. Philip Morris USA, Inc.*,
    449 F.Supp. 2d 1 (D.D.C. 2006) ..............................................31, 33

*United States v. Williams*,
    553 U.S. 285 (2008)......................................................................13

*Virginia Bd. of Pharmacy v. Va. Citizens Consumer Council*,
    425 U.S. 748 (1976)......................................................................15

*Ward v. Rock Against Racism*,
    491 U.S. 781 (1989)......................................................................22

*West Lynn Creamery, Inc. v. Healy*,
    512 U.S. 186 (1994)........................................................................7

*Wine & Spirits Retailers, Inc. v. Rhode Island* (*Retailers I*),
    418 F.3d 36 (1st Cir. 2005) ....................................................4, 6, 26

*Wine & Spirits Retailers, Inc. v. Rhode Island* (*Retailers II*),
    481 F.3d 1 (1st Cir. 2007) ...............................................................................26


## STATUTES

15 U.S.C. § 13 ....................................................................................................8

15 U.S.C. § 77e .................................................................................................13

15 U.S.C. § 1335................................................................................................34

16 U.S.C. § 1423a..............................................................................................13

21 U.S.C. § 353 .................................................................................................12

21 U.S.C. § 843 .................................................................................................13

Cal. Civ. Code § 51.6...........................................................................................8

Prov. Home Rule Charter, art. I, § 103..............................................................30

Prov. Home Rule Charter, art. IV, § 401 .......................................................3, 31

R.I. Const., art. 13, § 2 ......................................................................................30

R.I. Gen. Laws § 3-8-1.......................................................................................14


## OTHER AUTHORITIES

Centers for Disease Control & Prevention (CDC), *State Cigarette
    Minimum Price Laws – United States, 2009* (2010),
    http://www.cdc.gov/mmwr/ preview/mmwrhtml/mm5913a2.htm....................7

F.J. Chaloupka *et al.*, *Tax, Price, and Cigarette Smoking*,
    11 Tobacco Control (Supp. I) i62 (2002) ........................................................18

Fed. Trade Comm'n, Cigarette Report for *2011* (2013),
    http://www.ftc.gov/os/2013/05/130521cigarettereport.pdf..............................34

E.C. Feighery *et al.*, *How do minimum cigarette price laws affect cigarette prices at the retail level?*
14 Tobacco Control 80 (2005) .........................................................................7

Douglas Houston & John Howe, *An Economic Rationale for Couponing*,
24 Quarterly J. of Bus. & Econ. 2: 35 (1985).....................................17

Chakravarthi Narasimhan, *A Price Discrimination Theory of Coupons*,
3 Marketing Science (2) 128 (1984) .............................................17

National Conference of State Legislatures, Summary of State
"Price Gouging" Statutes and Regulations (2004)
*at* http://apps.americanbar.org/antitrust/at-committees/at-fe/pdf/
programs/spring-06/price-gouging-statutes.pdf...................................7

Note, *Making Sense of Hybrid Speech: A New Model for Commercial Speech and Expressive Conduct*,
118 Harv. L. Rev. 2836 (2005) .........................................................29

John Pierce *et al.*, *Tobacco Industry Price-Subsidizing Promotions May Overcome the Downward Pressure of Higher Prices on Initiation of Regular Smoking*,
14 Health Econ. 1061 (2005) ............................................... 17, 18, 34

Robert Post, *The Constitutional Status of Commercial Speech*,
48 UCLA L. Rev. 1 (2000) ...............................................................3

Susan Dente Ross, *Reconstructing First Amendment Doctrine: The 1990s (R)evolution of the* Central Hudson *and* O'Brien *Tests*,
23 Hastings Comm. & Ent. L.J. 723 (2001) ....................................29

Sandy Slater et al., *The Impact of Retail Cigarette Marketing Practices on Youth Smoking Uptake*,
Archives Pediatric & Adolescent Med. 440 (2007).........................33

Tobacco Master Settlement Agreement with the States,
http://ag.ca.gov/tobacco/msa.php.....................................................34

U.S. Department of Health and Human Services, *Preventing Tobacco Use Among Youth and Young Adults: A Report of the Surgeon General* (2012),
http://www.cdc.gov/tobacco/data_statistics/sgr/2012/index.htm.....................33

Victoria White *et al.*, *Cigarette Promotional Offers: Who Takes Advantage?*,
30 Am. J. Prev. Med. (3) 225 (2006) ........................................................17, 33

## STATEMENT OF INTEREST OF *AMICUS CURIAE*

The Tobacco Control Legal Consortium is a national network of non-profit legal centers[1] providing technical assistance to public officials, health professionals and advocates concerning legal issues related to tobacco and public health.[2]  The Consortium supports public policies that will reduce the harm caused by tobacco use.

The Consortium serves as *amicus curiae* in cases where its experience and expertise may assist courts in resolving tobacco-related legal issues of national significance.  Many of the Consortium's briefs – in the United States Supreme Court, United States Courts of Appeals, and state courts around the nation – have addressed First Amendment claims brought by the tobacco industry to challenge government regulation.

The Consortium exists to protect the public from the devastating health consequences of tobacco use.  It has a strong interest in this case, which marks the first time a First Amendment challenge has been brought against a straightforward tobacco pricing ordinance.  If this challenge – and its audacious theory of what constitutes free speech – succeeds, it would

---

[1] The legal centers affiliated with the Consortium are listed in the Appendix.
[2] *Amicus* has received the parties' consent to file this brief.  No counsel of any party to this proceeding authored any part of this brief.  No party or party's counsel, or any other person – other than *amicus* – contributed any money to fund the preparation or submission of this brief.

undermine many of the protections that the Consortium has worked to establish.

**INTRODUCTION AND SUMMARY OF ARGUMENT**

Providence's Price Ordinance brings government oversight to an area at the heart of the City Council's duty "to insure the welfare and good order of the city."  Prov. Home Rule Charter, art. IV, § 401(a).  Recognizing the dangers of lifelong addiction to tobacco, the City has acted to address one of the most prominent and pernicious sales strategies currently employed by the tobacco industry: the use of discount coupons and multi-pack discounts to attract new, principally young, tobacco users.

The freedom of speech guaranteed by the First Amendment is one of "the most cherished policies of our civilization."  *Bridges v. California*, 314 U.S. 252, 260 (1941).  But if this guarantee can be applied indiscriminately to the most mundane business conduct, it will cease to provide meaningful protection to genuine expression.  "To say that the First Amendment protects the sale or dissemination of all objects … would entirely drain the First Amendment of meaning."  *Mastrovincenzo v. City of New York*, 435 F.3d 78, 92 (2d Cir. 2006); *see also Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 455-56 (1978) (warning, in an analogous context, against "dilution, simply by a leveling process, of the force of the Amendment's guarantee"); Robert Post, *The Constitutional Status of Commercial Speech*, 48 UCLA L. Rev. 1, 10 (2000) ("Nothing could be more damaging to the First

3

Amendment than to . . . transform it into a mere basis for reviewing economic regulations").

The capacity of government to regulate for the common good will be hobbled if virtually every commercial law can be held to infringe constitutionally guaranteed expression. *Cf. Lochner v. New York*, 198 U.S. 45, 73 (1905) (Holmes, J., dissenting) (warning that overextension of 14th Amendment "economic liberty" principles would "cripple the inherent power of the states to care for the lives, health, and wellbeing of their citizens").

Fortunately, the First Amendment does not require that all commercial activity be protected as speech, or that government be hamstrung in its ability to regulate business practices. Under well-established law, the sales practices affected by the Price Ordinance do not involve constitutionally protected interests. *See Wine & Spirits Retailers, Inc. v. Rhode Island* (*Retailers I*), 418 F.3d 36, 52 (1st Cir. 2005) ("no First Amendment interest stands in the way of a State's rational regulation of economic transactions"). Discounting is a routine business practice, not protected expression; prohibiting discounts is simply one way of regulating price, a measure well within the purview of basic governmental authority.

4

The analysis should end there.  But even if the Price Ordinance could be imagined somehow to affect expression protected by the First Amendment, it would be at most an incidental burden on expressive conduct, and the Ordinance would easily withstand review under the applicable constitutional standard.  *See United States v. O'Brien*, 391 U.S. 367, 376 (1968).

In sum, Providence has acted to safeguard its population from the single greatest preventable threat to public health, *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 161 (2000), and has done so comfortably within the bounds of the First Amendment.

<u>**ARGUMENT**</u>

**I.    THE PRICE ORDINANCE IS AN UNEXCEPTIONAL REGULATION OF COMMERCIAL CONDUCT THAT DOES NOT IMPLICATE THE FIRST AMENDMENT.**

The Price Ordinance is a straightforward commercial regulation.  It does not suppress or in any way restrict communication about tobacco products; it simply regulates the way those products are priced.

**A.    Regulation Of Pricing, Like Other Regulation Of Commercial Transactions, Is Subject To Rational Basis Review.**

It has long been settled that regulation of "'ordinary commercial transactions'" is subject to "rational basis review requir[ing] deference to reasonable underlying legislative judgments."  *Armour v. City of Indianapolis*, 132 S. Ct. 2073, 2080 (2012) (quoting *United States v. Carolene Products Co.*, 304 U.S. 144, 152 (1938)); *see also Retailers I*, 418 F.3d at 53 ("economic legislation [that] neither employs suspect classifications nor infringes on fundamental rights … need only survive rational basis scrutiny"); *accord Kittery Motorcycle, Inc. v. Rowe*, 320 F.3d 42, 47 (1st Cir. 2003).

Regulation of pricing falls squarely within the category of economic measures subject to rational basis review.  *See Tenoco Oil Co., Inc. v. Dep't of Consumer Affairs*, 876 F.2d 1013, 1022 (1st Cir. 1989) (it is "beyond

dispute that [the government] may legitimately regulate . . . prices . . . if it thinks that the public interest requires").

Minimum and maximum price laws, for example, have been considered constitutionally unproblematic for decades. *See West Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 201 (1994) (upholding states' power to set minimum prices); *Simonetti, Inc. v. State ex rel. Gallion*, 132 So. 2d 252, 253 (Ala. 1961) (noting that 38 United States jurisdictions had enacted minimum price laws, and "the courts have been practically unanimous in affirming the principles of these laws against constitutional attack");[3] *In re Permian Basin Area Rate Cases*, 390 U.S. 747, 769 (1968) (finding "[n]o constitutional objection" to imposition of maximum prices).[4]

Appellants nevertheless contend, and seek to have this Court be the first to proclaim, that the outcome is different for a law that in effect simply

---

[3] As of 2005, twenty-five states had minimum price laws specifically for cigarettes. E.C. Feighery *et al.*, *How Do Minimum Cigarette Price Laws Affect Cigarette Prices at the Retail Level?*, 14 Tobacco Control 80, 80 (2005). None has been found unconstitutional. Seven of those states, including Massachusetts, prohibit discounting. Ctrs. for Disease Control & Prevention (CDC), *State Cigarette Minimum Price Laws – United States, 2009* (2010), *at* http://www.cdc.gov/mmwr/preview/mmwrhtml/mm5913a2.htm.

[4] As of 2004, twenty-eight states and the District of Columbia had "price gouging" statutes or regulations, limiting price increases for various goods and services in emergencies. National Conference of State Legislatures, Summary of State "Price Gouging" Statutes and Regulations (2004), *at* http://apps.americanbar.org/antitrust/at-committees/at-fe/pdf/programs/spring-06/price-gouging-statutes.pdf.

requires a retail outlet to offer the same price on the same product to all its customers.  In reality, bans on differential pricing are as familiar, and as constitutionally unproblematic, as minimum price laws.  *See, e.g.*, 15 U.S.C. § 13(a) (prohibiting sellers from discriminating in price among commercial buyers when competition would be undermined); Cal. Civ. Code § 51.6(b) (prohibiting discrimination based on gender in prices charged for services).

Laws regulating multi-tiered pricing are subject to the same lenient standards of review applied to other price regulations.  *See Safeway Stores, Inc. v. Oklahoma Retail Grocers Ass'n, Inc*., 360 U.S. 334, 342 (1959) (upholding state law's differentiation between discounting through trading stamps and reducing prices directly, because "[w]e are not concerned with the soundness of the distinctions drawn.  It is enough that it is open to Oklahoma to believe them to be valid as the basis of a policy").

Notwithstanding such clear precedent, the tobacco industry insinuates that laws prohibiting discount mechanisms are somehow different from other – concededly constitutional – price regulations, either because the laws supposedly regulate commercial speech about prices, or because discounts themselves are somehow communicative.  Neither suggestion has merit.

### B.  The Price Ordinance Regulates Commercial Transactions, Not Commercial Speech.

As noted by the district court, the Price Ordinance regulates pricing, not communication about prices.  Slip op. at 4.  It directly prohibits retailers from charging different prices to different customers.

### 1.  The Ordinance governs pricing, not communication about pricing.

The tobacco industry's arguments that the Ordinance regulates speech rather than pricing are meritless.  The industry asserts that the Price Ordinance is not a price regulation because it does not specify a minimum price – because "[i]t does not, for example, prevent manufacturers and retailers from cutting prices 20%."  Appellants' Opening Brief (AOB) at 30.  But to infer that the Ordinance is therefore not a price regulation is a *non sequitur*.  The Ordinance simply regulates pricing in a different way:  by requiring in effect that all customers in a single retail outlet pay the same price for the same product.

Similarly fallacious is the industry's argument that the Ordinance "regulates what is said about prices and discount promotions, not the prices themselves[,]" because "under the Ordinance, a retailer may … lower prices … from $10 to $8, but may *not* offer or honor a coupon that describes the *same* $2 price discount as lower than the 'listed or non-discounted' price."

AOB at 3 (emphasis in original).  Nonsense.  Retailers are free to employ

any truthful description of the prices they may legally offer.  What they may

not do is use certain discounting mechanisms to offer the same product at

different prices to different consumers.  That is regulation of ordinary

business conduct; it is not restriction of protected speech.

The speciousness of Appellants' reasoning is illustrated by their own

example:  the Ordinance, they claim, "prohibits [manufacturers and retailers]

from using coupons to *communicate to consumers the message* that they can

purchase tobacco products for 20% less than their regular price.  This is

clearly a restriction on speech."  *Id.* (emphasis in original).  In reality,

nothing prevents a seller from reducing the prices of tobacco products (in

conformity with the state's minimum price law) and informing consumers of

that fact.  What the retailer may *not* say is that it is selling two cigarette

packages for the price of one, or redeeming 20%-off coupons – but that is

only because it may not legally engage in those transactions.  This

consequence does not make the Price Ordinance a restriction on protected

speech any more than a minimum price law would restrict speech because it

forbids a seller from saying that she is selling below the minimum price.  *Cf.*

*Coldwell Banker Residential Real Estate Servs. v. Missouri Real Estate*

*Comm'n*, 712 S.W.2d 666, 670 (Mo. 1986) (First Amendment challenge to

prohibition on coupon incentive program "fails to distinguish between the inducement itself and the communication of the inducement…. The statute regulates conduct, not speech"); *Coldwell Banker Residential Real Estate Servs., Inc. v. New Jersey Real Estate Comm'n*, 576 A.2d 938, 942 (N.J. Super. Ct. App. Div. 1990) (Plaintiff "complains that the prohibition of its coupon programs violates the First Amendment's protection of commercial speech. Not so. It is the non-verbal conduct of employing extraneous inducements to produce … sales that is prohibited").[5]

The Supreme Court has underscored the significance of the distinction between suppressing price information and regulating prices, specifically designating the latter a permissible, non-speech-restrictive alternative when striking down restrictions on commercial speech as more extensive than necessary. In invalidating Rhode Island prohibitions on advertising liquor prices, the Court reasoned that maintaining "higher prices … by direct regulation" would be an "alternative form[] of regulation that would not involve any restriction on speech." *44 Liquormart, Inc. v. Rhode Island*, 517

---

[5] A third Coldwell Banker case found that a prohibition on inducements was in effect an advertising regulation subject to *Central Hudson* review. *Coldwell Banker Residential Real Estate Servs. v. Clayton*, 475 N.E.2d 536, 540 (Ill. 1985). However, unlike the contrary cases, the court offered no analysis in support of its conclusion.

U.S. 484, 507 (1996) (plur. op.); *accord id.* at 530 (O'Connor, J., conc. in judgment, joined by two other Justices).

### 2. Any commercial speech restricted by the ordinance is related to illegal activity and therefore not protected by the First Amendment.

That the Ordinance restricts tobacco sellers not only from redeeming discount coupons, but also from *offering* to redeem them, hardly transforms the measure into an assault on free expression. "Economic regulations, otherwise valid, are not rendered invalid simply because availability of the prohibited activity must be communicated to serve its purpose." *Coldwell Banker*, 712 S.W.2d at 671.

Even if the restriction on "offer[s]" to redeem coupons or multi-pack deals were considered out of context and determined to be "speech,"[6] the First Amendment would not provide grounds for attacking the measure. Laws prohibiting certain transactions often also proscribe offers to engage in the prohibited transaction. *See, e.g.*, 21 U.S.C. § 353(c)(2) ("No person may

_____

[6] Contrary to Appellants' representation, AOB at 29, *Rockwood v. Burlington*, 21 F. Supp. 2d 411 (D. Vt. 1998), did not address whether restrictions on tobacco coupons regulated commercial speech. Rather, the district court struck down an ordinance section that included a prohibition of discount coupon *distribution*, on the ground that the section "ban[ned] virtually all publicly visible advertising of tobacco products," *Rockwood*, 21 F. Supp. 2d at 423, with no discussion whatsoever of the coupon provision. Several (though not all) of those other restrictions were later upheld in *Discount Tobacco City & Lottery v. United States*, 674 F.3d 509 (6th Cir. 2012), *cert. denied*, 2013 WL 1704718.

sell, purchase, or trade *or offer to* sell, purchase, or trade … *any coupon*"
conferring discounts on or free quantities of covered prescription drugs)
(emphasis added); 16 U.S.C. § 1423a(a) ("It is unlawful for any person … to
. . . sell . . . or offer to sell . . . any polar bear gall bile"); 15 U.S.C. § 77e(c)
("It shall be unlawful … to offer to sell or offer to buy" unregistered
securities); 21 § 843(c)(2)(A) ("It shall be unlawful for any person to … use
the Internet … to advertise the sale of, or to offer to sell, distribute, or
dispense, a controlled substance"); *see also United States v. Evans*, 699 F.3d
858, 868 (6th Cir. 2012) ("a conviction … for offering to sell a controlled
substance … qualifies as a controlled substance offense").

If Appellants were right that prohibiting offers to redeem discount
coupons implicated the First Amendment, all of the foregoing statutes
should likewise be subject to heightened scrutiny as infringements of First
Amendment rights. That is not the law. "Offers to engage in illegal
transactions are categorically excluded from First Amendment protection."
*United States v. Williams*, 553 U.S. 285, 297 (2008). The Price Ordinance
makes certain transactions illegal. Consequently, the First Amendment does
not protect "[o]ffers to engage" in such transactions. *Id.*

Similarly, "[a]ny First Amendment interest which might be served by
advertising an ordinary commercial proposal … is altogether absent when

13

the commercial activity itself is illegal and the restriction on advertising is incidental to a valid limitation on economic activity." *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 389 (1973); *see also Cent. Hudson Gas & Elec. Corp. v. Public Serv. Comm'n*, 447 U.S. 557, 563-64 (1980) ("government may ban … commercial speech related to illegal activity").

The fact that tobacco sales are not prohibited entirely does not change the analysis. The First Amendment does not protect advertisements for illegal commercial transactions involving substances whose sale may be legal in other contexts. For example, even though it is in general legal for adults to purchase alcohol, the First Amendment does not mandate that liquor stores be free to advertise that they offer alcohol for sale before noon on Sundays, in violation of R.I. Gen. Laws § 3-8-1 (2012). *See Lamar Outdoor Adver., Inc. v. Miss. State Tax Comm'n*, 701 F.2d 314, 321 (5th Cir. 1983) ("The proper focus … is upon the legality of the *transaction proposed* by the advertising") (emphasis in original). Similarly, the fact that cigarette purchases are legal for adults does not confer First Amendment protection on advertisements for the sale of cigarettes through unlawful discounts.

Consequently, the classic commercial speech decisions on which Appellants rely have no bearing on the present case. If tobacco retailers

were legally permitted to sell cigarettes at discounts to purchasers of multiple packs or to bearers of coupons, but were not allowed to advertise that fact, then *Virginia State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.,* 425 U.S. 748 (1976), might indeed apply.  But here there is no "suppression of price information."  *Id.* at 763; *see also id.* at 772 (in marked distinction to the present case, "there is no claim that the transactions proposed in the forbidden advertisements are themselves illegal in any way").

To the contrary, tobacco retailers are free under Providence's Ordinance to advertise any price that they may legally charge.[7]  *Cf. In re Bd. of Pharmacy Decision to Prohibit the Use of Advertisements Containing Coupons for Prescription Drugs*, 465 A.2d 522, 523 (N.J. Super. Ct. App. Div. 1983) (rejecting First Amendment challenge to ban on rebate coupons for prescription drugs; plaintiffs' citations to commercial advertising cases were not "in point [because] in none of them would the proscribed commercial advertising have advertised an activity itself unlawful, as on this appeal"); *Coldwell Banker*, 712 S.W.2d at 670 ("If the discount program is

---

[7] Appellants' reliance on *South Ogden CVS Store, Inc. v. Ambach*, 493 F. Supp. 374 (S.D.N.Y. 1980) is similarly misplaced.  In that case, the court struck down regulations burdening advertisements for *legal* discounts on prescription medications.  *See id.* at 380 ("the information which plaintiff seeks to communicate is not in itself illegal").

15

contrary to law the plaintiff has no greater right to advertise it than to advertise a chicken fight or a house of prostitution"); *Coldwell Banker*, 576 A.2d at 942 (if coupon inducement program "is lawfully barred, as we conclude it may be, advertising the unlawful conduct is not speech protected by the First Amendment"); *Ralph Rosenberg Court Reporters, Inc. v. Fazio*, 811 F. Supp. 1432, 1442 (D. Haw. 1993) ("the fact that [the government] has substantively banned the underlying transaction means that speech related to the programs is 'related to unlawful activity'").

The only commercial speech arguably restricted by Providence's Price Ordinance is speech offering or advertising transactions that the Ordinance makes illegal. That speech is not protected.

### C. Coupons And Other Discounting Mechanisms Are No More Communicative Than Any Other Retailer Pricing Strategies.

There is equally little merit to Appellants' suggestions that the prohibited discounts themselves constitute speech. Indeed, discounting does not even constitute expressive conduct.

### 1. Multi-tiered price structures are employed for business reasons unrelated to expression.

A multi-tiered pricing structure is no more communicative than any other pricing scheme. It is simply a course of commercial conduct that a

firm may choose when faced with the question of how to set prices to maximize profits.

Discount coupons, for example, enable a seller to increase revenues by continuing to charge a higher price to consumers whose demand is less price-sensitive (and who therefore are unlikely to take the trouble to collect coupons), without losing customers who are more concerned about savings (and can buy the product at a lower price using coupons). *See, e.g.*, John Pierce *et al.*, *Tobacco Industry Price-Subsidizing Promotions May Overcome the Downward Pressure of Higher Prices on Initiation of Regular Smoking*, 14 Health Econ. 1061, 1062 (2005); Chakravarthi Narasimhan, *A Price Discrimination Theory of Coupons*, 3 Marketing Science, Spring 1984, at 128.

Coupons and other special discounts are also used to attract new consumers who may then continue to purchase a product or brand at the regular price. *See* Douglas Houston & John Howe, *An Economic Rationale for Couponing*, 24 Q.J. Bus. & Econ., Spring 1985, at 35, 37.

This practice is particularly important to tobacco companies, whose profits depend on getting new users addicted to their product before those users are old enough to make a reasoned choice about tobacco use. *See* Victoria White *et al.*, *Cigarette Promotional Offers: Who Takes Advantage?*,

30 Am. J. Prev. Med. 225, 229 (2006) (tobacco companies need "to encourage . . . young adult smokers to increase their dependency and to smoke their brand for many years rather than quit before they become heavily addicted"). Young tobacco users are precisely the consumers targeted by coupons and other discounting mechanisms. *See* Pierce, *supra* at 1062 ("price-subsidizing promotions are likely targeted at the most price-sensitive consumers, including younger new smokers and would-be smokers"); F.J. Chaloupka *et al.*, *Tax, Price, and Cigarette Smoking*, 11 Tobacco Control (Supp. I) i62, i64 (2002) (surveying studies showing that youth smoking varies significantly more with price than does adult smoking).

Internal industry documents confirm that the tobacco industry has deliberately relied on discount pricing strategies to recruit young tobacco users to replace customers who have died from tobacco-related illnesses. An internal 1984 R.J. Reynolds memorandum, for example, after noting that young smokers are more price-sensitive, advised: "Tactically, extended periods of closely targeted pack promotion (B1G1F (buy-one get-one free), sampling) in selected sites … could lead to brand loyalty from repeated trial. This should be considered an investment program." Chaloupka, at i69-i70.

In sum, multi-tiered pricing structures, whether effected through coupons or multiple pack discounts, are motivated by the same business considerations, serve the same ends, and are no more communicative than any other way of setting prices.

### 2.     Transactions involving coupons and multi-pack discounts do not themselves constitute speech.

The use of coupons or multi-pack deals as a discounting mechanism does not constitute "speech."  Coupons *may* be employed communicatively – as, for example, when they are distributed to passersby as the equivalent of handbills touting a product.  However, they may also be used in ways that have nothing to do with communication, as when a checkout clerk keeps the weekly store circular by the cash register and simply scans the relevant coupon's UPC symbol when a customer presents that item.

The Ordinance regulates only the latter kinds of use, *i.e.*, it prohibits use of coupons to effect certain kinds of transactions.  It does not prevent sellers from distributing flyers that contain whatever non-discount-related advertising content might have been printed on a coupon.  In other words,

any *communicative* function of a coupon remains perfectly legal under the Ordinance.[8]

Neither are the prohibited discounting mechanisms in themselves speech protected by the First Amendment.  Appellants suggest that, because discounts are used to induce sales, the discounts *themselves* (and not just speech about them) somehow constitute commercial speech.  *See* AOB at 29.  This suggestion is vacuous.  Even if discount mechanisms can be characterized as *promotions*, that does not render them commercial *speech*.  If it did, other price promotions, such as simple reductions in price for all consumers, would likewise constitute commercial speech, and minimum price laws might offend the First Amendment.  The reality is that not all "promotion" is commercial speech.  *See Jones v. Vilsack*, 272 F.3d 1030, 1037 (8th Cir. 2001) ("We may not conflate the 'advertising' and 'promotion' of cigarettes").

The fact that consumers may be influenced by discounts to buy a product does not make discounts themselves communicative – even if, as Appellants argue, *see* AOB at 30 n.3, consumers prefer discounts to everyday low prices.  In reality not every way of influencing behavior

---

[8] Moreover, as noted by the district court, the Ordinance does not outlaw the production and distribution of coupons offering discounts.  Slip op. at 4. Tobacco companies are free to send coupons to residents of Providence for use elsewhere.

constitutes communication.  By Appellants' reasoning, tobacco companies' proven practice of manipulating nicotine levels in cigarettes to foster addiction, *see U.S. v. Philip Morris USA*, *Inc*., 566 F.3d 1095, 1107 (D.C. Cir. 2009), is simply a particularly effective way of "persuading" smokers to keep smoking, and is therefore expression that may not be regulated without heightened scrutiny under the First Amendment.  That cannot be the law.  If a new flavor of toothpaste causes consumers to switch brands, or causes them to brush their teeth more often, it does not follow that wintergreen is speech.  Neither nicotine nor toothpaste is any "essential part of any exposition of ideas."  *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942).  Nor is pricing.  "The censorial motive plaintiff attributes to defendants is always present when the government restricts sales of a product.  That can't be sufficient" to raise First Amendment concerns. *Philip Morris USA, Inc. v. San Francisco*, 345 F. App'x 276, 277 (9th Cir. 2009) (unpub.).

Equally unconvincing is the tobacco industry's suggestion that because Providence "has not articulated an interest in generally regulating … coupons or multi-item discounts … across consumer categories," AOB at 30, it somehow follows that the City is seeking "to regulate the communicative impact of the activity, not the activity itself."  *Id.* at 29.

Once again, the same could be said of minimum price laws for tobacco products – or tobacco taxes; after all, Rhode Island does not seek to keep the prices of *all* products sufficiently high, only tobacco products. Indeed, by Appellants' reasoning, laws restricting where, when, or to whom tobacco or alcohol may be sold, or laws requiring a prescription for certain medications, are 'content-based' regulations that offend the First Amendment, unless similar restrictions apply to all products.

Appellants have it backwards. Restrictions on speech invoke heightened scrutiny if they target particular content. *See Ward v. Rock Against Racism,* 491 U.S. 781, 791 (1989). It does not follow that focusing on a particular product transforms a pricing policy into a restriction on speech. If it did, any regulation of sales of a particular product would violate the First Amendment. In reality, "[p]rice control, like any other form of regulation, is unconstitutional only if arbitrary, discriminatory, or demonstrably irrelevant to … policy the legislature is free to adopt." *Nebbia v. New York*, 291 U.S. 502, 539 (1934); *accord Mora v. Mejias*, 223 F.2d 814, 816 (1st Cir. 1955).

### 3. Selling products at a discount is not even expressive conduct.

While virtually any human activity may be characterized as having some expressive component, *see O'Brien*, 391 U.S. at 376, the First

Amendment does not protect all activities that can be so described.  *See City of Dallas v. Stanglin*, 490 U.S. 19, 25 (1989) ("It is possible to find some kernel of expression in almost every activity a person undertakes – for example, walking down the street or meeting one's friends at a shopping mall – but such a kernel is not sufficient to bring the activity within the protection of the First Amendment").

First Amendment protection for conduct extends "only to conduct that is inherently expressive," *Rumsfeld v. Forum for Acad. & Inst. Rights, Inc.* (*FAIR*), 547 U.S. 47, 66 (2006) – *i.e.*, to conduct that is "sufficiently imbued with elements of communication."  *Spence v. Washington*, 418 U.S. 405, 409 (1974).  Conduct meets that standard when it demonstrates "[a]n intent to convey a particularized message … [and] the likelihood [is] great that the

message would be understood by those who view[] it.'"[9]  *Gun Owners'*

*Action League, Inc. v. Swift*, 284 F.3d 198, 211 (1st Cir. 2002).

In order "to avoid creating a rule that all conduct is inherently

expressive," the Supreme Court has established that "the person desiring to

engage in assertedly expressive conduct [must] demonstrate that the First

Amendment even applies."  *Clark v. Cmty. for Creative Non-Violence,* 468

U.S. 288, 293 n.5 (1984).  That is a burden Appellants cannot meet.

Price discounts, whether offered through coupon redemptions, special

prices for multiple purchases, or any other mechanism, do not – and are not

intended to – "convey a particularized message," still less one that would

---

[9] Both cases cited by Appellants for the proposition that the Ordinance
regulates commercial speech, AOB at 28-29, improperly conflate
commercial speech and expressive conduct, applying the "intent" test (which
is properly employed only to determine whether conduct is expressive) to
conclude that the conduct in question was commercial speech subject to
*Central Hudson* review.  *See Discount Tobacco*, 674 F.3d at 538 (free
samples and gifts with purchases conveyed "twin messages"); *Bailey v.
Morales*, 190 F.3d 320, 325 (5th Cir. 1999) (promotional gifts evinced
"intent to convey a particularized message" that recipients were likely to
understand).  The court in *Discount Tobacco* may have been unconcerned
with the distinction because it went on to find that the conduct in question
passed even *Central Hudson* review, a fact Appellants do not mention.
Furthermore, *Discount Tobacco* never addressed discounts; whatever
communicative impact a restriction on *distributing* samples may have is
absent from a restriction on *redeeming* coupons.  *Bailey* dubiously located a
protected "message" in ordinary promotional conduct and, in any event,
involved arguably communicative activity – "*offering* to give money or
anything of value," 190 F.3d at 325 (emphasis added) – which is absent from
the transaction of redeeming a coupon.

likely be understood.  The closest Appellants come to identifying a particularized understandable message that might be expressed by discounts is "'the price you're getting is less than the regular price' or 'you're getting a bargain.'"  AOB at 30.  But if those alleged messages were sufficiently particularized to merit First Amendment protection, then so would be the "message" conveyed by virtually any business activity.  One could as easily argue that the First Amendment is implicated by minimum price laws, because they prevent sellers from conveying through their prices "Buy this product because it's inexpensive" or "Purchase this item because it costs less than rival brands."  Simply offering a product for sale could express the message "Buy this item, because it is safe and suitable for purchase."  If so, then any sales regulation of any product – prescription drugs, firearms, explosives – should be subject to First Amendment scrutiny.  That is manifestly not the law.

There is nothing singularly expressive about multi-tiered pricing schemes that would make them an exception to the rule that "[m]ost human conduct, especially in the commercial realm, is not expressive."  *State v. Chepilko*, 965 A.2d 190, 198 (N.J. Super. App. Div. 2009); *see also Sorrell v. IMS Health Inc.*, 131 S.Ct. 2653, 2665 (2011) ("restrictions on protected expression are distinct from restrictions on economic activity"); *Wine And*

*Spirits Retailers, Inc. v. Rhode Island* (*Retailers II*), 481 F.3d 1, 6-7 (1st Cir.

2007) ("The conduct in question is not so inherently expressive as to warrant

First Amendment protection under the *O'Brien* doctrine"); *Retailers I*, 418

F.3d at 53 (regulation governed "commercial conduct exhibit[ing] nothing

that even the most vivid imagination might deem uniquely expressive").

Cigarette "advertising is protected expressive activity.  Selling

cigarettes isn't, because it doesn't involve conduct with a significant

expressive element….  It doesn't even have an expressive component."

*Philip Morris*, 345 F. App'x at 277.  The Ordinance regulates nothing but

the *selling* of tobacco.

## II.    THE PRICE ORDINANCE EASILY WITHSTANDS ANY POTENTIALLY APPLICABLE REVIEW UNDER THE FIRST AMENDMENT.

Even if the Price Ordinance were, implausibly, found subject to First

Amendment review, it would readily pass muster.

### A.    The Only Potentially Relevant Standard Is That Applied To Restrictions On Expressive Conduct.

If the Ordinance can be said to restrict protected expression at all, the

burden could arise only as an indirect effect of the law's regulation of non-

communicative business activities.  Consequently, the proper standard of

First Amendment review would be the relatively lenient test applied to

regulations of conduct that incidentally burden expression.  *See O'Brien*, 391 U.S. 367.

That is, even if discounting were in some way communicative, it would be considered expressive conduct rather than speech.  If burning a flag, *see Texas v. Johnson*, 491 U.S. 397, 404 (1989), or a draft card, *see O'Brien*, 391 U.S. 367, in order to communicate a political message constitutes no more than expressive conduct, it defies credulity to suggest that selling tobacco at reduced prices is speech.

The poverty of Appellants' argument that the more stringent *Central Hudson* test should apply here is exposed by the lone authority they offer in support: a section of *Lorillard* that struck down limits on the location of in-store *advertisements*.  AOB at 38, citing 533 U.S. at 567.  But, with the possible exception of advertising for illegal activity, this case does not concern advertisements.  In fact, later in the *Lorillard* opinion – in a section ignored by Appellants – the Court made clear the standard applicable to regulations of tobacco sales that do not restrict advertising, applying the *O'Brien* test to regulations of tobacco displays (without deciding whether those regulations implicated expression at all).  533 U.S. at 569.

### B.     The *O'Brien* Test Is Not A Stringent Standard.

The constitutional test for restrictions on expressive conduct is a

"relatively lenient" one.  *O'Brien,* 391 U.S. at 377; *accord United States v.*

*Hamilton*, 699 F.3d 356, 366 (4th Cir. 2012).

> Under this standard, … statutes need not be narrowly tailored to the
> government's interests or be the least restrictive means of achieving
> those interests.  Instead, … statutes need only satisfy the less stringent
> standard of promoting an important or substantial government interest
> in a manner that would be achieved less effectively absent the
> regulation.

*FAIR*, 547 U.S. at 67.

Appellants misrepresent the law in arguing that the *O'Brien* standard

"largely overlaps with the *Central Hudson* test."  AOB at 38.  Although that

assertion might once have had validity, the test for commercial speech has

become increasingly stringent,[10] while the expressive conduct inquiry has

remained notably lenient.  In *Lorillard*, as noted, the Supreme Court struck

down a series of advertising regulations under the *Central Hudson* test "as

applied in our more recent commercial speech cases," 533 U.S. at 554-55,

but sustained a related restriction on expressive conduct under the *O'Brien*

standard.  *Id*. at 569; *see also* Note, *Making Sense of Hybrid Speech: A New*

*Model for Commercial Speech and Expressive Conduct*, 118 Harv. L. Rev.

2836, 2838 (2005) ("although commercial speech and expressive conduct

are both … evaluated under similar four-part intermediate scrutiny tests, the

actual levels of review applied to restrictions … have diverged in recent

years"); Susan Dente Ross, *Reconstructing First Amendment Doctrine: The*

*1990s (R)evolution of the* Central Hudson *and* O'Brien *Tests*, 23 Hastings

---

[10] That is not to suggest that the *Central Hudson* test has become an impassable obstacle.  The Sixth Circuit's recent decision in *Discount Tobacco,* 674 F.3d 509, upholding under *Central Hudson* most of the marketing restrictions in the Family Smoking Prevention and Tobacco Control Act of 2009, illustrates that the test is by no means insurmountable – particularly for government regulations of tobacco marketing.  The Price Ordinance would readily pass the *Central Hudson* review called for by Appellants.  Like the regulations at issue in *Discount Tobacco*, the Ordinance serves "a substantial state interest in curbing juvenile tobacco use that can be directly advanced by imposing limitations on the marketing of tobacco products."  *Id.* at 541.  And it is no less narrowly tailored than were the regulations reviewed by the Sixth Circuit.  *See id.* at 541-43.  In this case as in that one, "Plaintiffs have failed to show that anything other than a nominal amount of protected speech is swept into the regulation."  *Id.* at 543.

Comm. & Ent. L.J. 723, 724-25 (2001) ("in the latter half of the 1990s, the

Court reshaped its *Central Hudson* analysis to imbue commercial speech

with increased First Amendment protection," while "the Court has relaxed

the standards imposed under *O'Brien*").  Indeed, as the City's brief observes,

*see* Response Brief (RB) at 36, neither this Court nor the Supreme Court has

found a law unconstitutional under the *O'Brien* standard in more than twenty

years.

### C.    The Price Ordinance Readily Passes The *O'Brien* Test.

A government regulation of conduct that incidentally burdens

expression is "sufficiently justified" if

> it is within the constitutional power of the Government; if it
> furthers an important or substantial governmental interest;
> if the governmental interest is unrelated to the suppression
> of free expression; and if the incidental restriction on
> alleged First Amendment freedoms is no greater than is
> essential to the furtherance of that interest.

*O'Brien,* 391 U.S. at 377.  The Price Ordinance – if it burdens expression at

all – easily meets each element of this standard.

### 1.    The Ordinance falls squarely within the City's authority.

Providence possesses ample authority to regulate retail tobacco

pricing.  *See* R.I. Const., art. 13, § 2) (granting home rule cities the authority

to "legislate with regard to all local matters"); Prov. Home Rule Charter, art.

30

I, § 103 ("The city shall have all powers of local self-government and home rule and all powers possible for a city to have"), art. IV, § 401 ("The powers and duties of the city council shall include . . . [t]o enact such ordinances as the city council may consider necessary to insure the welfare and good order of the city").  *See also* RB at secs. VII.B, VII.E; Brief of Amer. Acad. of Ped. *et al.* at secs. 3, 4.

### 2.    The Ordinance advances important government interests.

Providence plainly has an important interest in lowering tobacco use and preventing new users, especially youth, from taking up tobacco.  *See Lorillard*, 533 U.S. at 564 ("State's interest in preventing underage tobacco use is substantial, and even compelling").

That interest is clearly advanced by the Ordinance.  *See U.S. v. Philip Morris USA*, 449 F.Supp.2d 1, 640 (D.D.C. 2006) ("[The tobacco industry] could significantly reduce adolescent smoking by … stopping all price related marketing (i.e., discounting and value added offers of cigarettes)").

### 3.    The City's interest is unrelated to the suppression of expression.

The purpose of the Price Ordinance is to protect public health by reducing tobacco use, especially by new users.  The means employed to achieve this goal involve direct regulation of tobacco pricing by prohibiting

discount mechanisms that have been shown to increase youth uptake and smoking rates generally. As explained in sec. I, *supra*, these means do not involve any suppression of expression by tobacco manufacturers or retailers. The Ordinance is viewpoint- and content-neutral: it does not distinguish among motives for discounts or messages (if any) that might be conveyed thereby. If the measure somehow burdens expression, the burden is incidental.

### 4. The Ordinance effectively promotes the government's objectives.

The fourth element of the *O'Brien* test is not exacting. "So long as the means chosen are not substantially broader than necessary to achieve the government's interest, … the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative." *Turner Broad. Sys., Inc. v F.C.C.* (*Turner II*), 520 U.S. 180, 218 (1997). Rather, "the requirement of narrow tailoring is satisfied so long as the … regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." *Turner Broad. Sys., Inc. v F.C.C.* (*Turner I*), 512 U.S. 622, 662 (1994).

Providence's efforts to limit access to tobacco, particularly among youth, "would be achieved less effectively absent the regulation." *Id*. *See*

32

*Philip Morris*, 449 F. Supp. 2d at 639 ("price reductions … have reduced the rate of decline in overall cigarette smoking and contributed to the increases in youth smoking incidence and prevalence"); U.S. Department of Health and Human Services, *Preventing Tobacco Use Among Youth and Young Adults: A Report of the Surgeon General* 530 (2012) ("considering the numerous studies demonstrating that tobacco use among young people is responsive to changes in the prices of tobacco products, it can be concluded that the industry's extensive use of price-reducing promotions has led to higher rates of tobacco use among young people than would have occurred in the absence of these promotions");[11] Sandy Slater et al., *The Impact of Retail Cigarette Marketing Practices on Youth Smoking Uptake*, Archives Pediatric & Adolescent Med. 440, 444 (2007) ("findings support previous research that shows price-based promotional offers are particularly appealing to young price-sensitive smokers"); White, *supra,* at 228 (finding "strong evidence that tobacco industry [price] promotional offers are particularly appealing to certain market segments, including young adults").

Without restrictions on discounts, minimum price laws may be ineffective.  *See* Slater, *supra*, at 444 ("the beneficial effects of higher cigarette prices are undermined when youth are able to take advantage of

---

[11] *At* http://www.cdc.gov/tobacco/data_statistics/sgr/2012/index.htm.

cigarette promotions"); Pierce, *supra*, at 1067 ("tobacco industry expenditures on price-subsidizing promotions … appeared to have overcome the effect of [rapidly] increasing prices and to have halted the decline in the incidence of initiation of regular smoking").

Finally, the Ordinance "leaves open ample channels of communication." *Lorillard*, 533 U.S. at 569.  Any communicative component of a coupon may still be conveyed via a flyer.  All the rest of the vast array of tobacco advertising and other marketing techniques used at the point-of-sale (whether protected by the First Amendment or not) remain available.  *See* Fed. Trade Comm'n, *Cigarette Report for 2011* (2013).[12] Although Congress has barred the use of broadcast media, *see* 15 U.S.C. § 1335, any further limitations – such as the restrictions on outdoor and print advertising agreed to in the Master Settlement Agreement with the States[13] – are the result not of legislative imposition but of voluntary agreements by the tobacco industry to settle litigation.  Such self-imposed measures are not properly part of an assessment whether governmental restrictions leave open ample channels of communication.  The Pricing Ordinance does not significantly alter the channels of communication open to sellers of tobacco.

---

[12] *At* http://www.ftc.gov/os/2013/05/130521cigarettereport.pdf.
[13] *At* http://ag.ca.gov/tobacco/msa.php.

In sum, even if this Court examines the Ordinance as a restriction on protected expression, the law will stand.

## **CONCLUSION**

A law restricting coupon redemption and multi-pack sales of tobacco does not violate the First Amendment.  The district court's rejection of the tobacco industry's free speech challenge to the Price Ordinance should be affirmed.


DATED:      June 4, 2013

Respectfully submitted,


Seth E. Mermin                             Raymond A. Marcaccio
Thomas Bennigson                      (#73443)
PUBLIC GOOD LAW CENTER        OLIVERIO & MARCACCIO, LLP
3130 Shattuck Ave.                      55 Dorrance Street, Suite 400
Berkeley, CA 94705                      Providence, RI 02903
(510) 393-8254                             (401) 861-2900 x102
(510) 849-1536 (facsimile)          (401) 861-2922 (facsimile)
TMermin@publicgoodlaw.org       RAM@om-rilaw.com


*/s/ Seth E. Mermin*                       */s/ Raymond A. Marcaccio*


Seth E. Mermin                             Raymond A. Marcaccio


*Attorneys for* amicus curiae
*Tobacco Control Legal Consortium*

35

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitations of Fed. R. App. P. 29(d) and 32(a)(7)(B).  The brief contains 6956 words, according to Microsoft Word, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6). The brief has been prepared in a proportionally spaced 14-point typeface including serifs. The typeface is Times New Roman.

I certify that the information on this form is true and correct to the best of my knowledge and belief formed after a reasonable inquiry.

DATED: June 4, 2013

*/s/ Raymond A. Marcaccio*

## CERTIFICATE OF SERVICE

I hereby certify that on June 4, 2013, I caused a true and accurate copy of the Brief of *Amicus Curiae* Tobacco Control Legal Consortium to be filed electronically via the Court's CM/ECF System, and thereby served on all counsel registered to receive electronic notices.

DATED:     June 4, 2013

*/s/Raymond A. Marcaccio*

Raymond A. Marcaccio

## APPENDIX

### Tobacco Control Legal Consortium

The Tobacco Control Legal Consortium is based at the Public Health Law Center, Inc., of the William Mitchell College of Law in St. Paul, Minnesota. Affiliated legal centers include: ChangeLab Solutions, Oakland, California; Legal Resource Center for Tobacco Regulation, Litigation & Advocacy, at University of Maryland School of Law, Baltimore, Maryland; Public Health Advocacy Institute, at Northeastern University School of Law, Boston, Massachusetts; Smoke-Free Environments Law Project, at Center for Social Gerontology, Ann Arbor, Michigan; Tobacco Control Policy and Legal Resource Center at New Jersey GASP, Summit, New Jersey; and Center for Public Health and Tobacco Policy at New England Law | Boston.

To date the Consortium has filed thirty-four amicus briefs in twenty-nine separate cases in the United States, including cases before the Supreme Court of the United States; the Courts of Appeals for the Second, Fifth, Sixth, Ninth, and D.C. Circuits; the U.S. District Courts for the Districts of Columbia and Rhode Island; and the state appellate courts of California, Delaware, Florida, Kentucky, Maryland, Massachusetts, Minnesota, Missouri, Montana, New Hampshire, North Carolina, Ohio, South Carolina, and Washington.